VERNON CASUALTY & REINSURANCE COMPANY, Inc., Appellant,

v.

Rose ROSENBERG, Executrix of the Estate of Alvin Rosenberg, Sr., Appellee.

Court of Appeals of Kentucky.

May 27, 1955.

J. W. Clements, Louisville, for appellant.

Edwin O. Davis, Louisville, for appellee.

STEWART, Chief Justice.

This appeal is from a judgment reforming an insurance policy on the ground of mutual mistake and awarding appellee $2,996.16 and accrued interest.

Alvin Rosenberg, Sr., along with his son, Alvin Rosenberg, Jr., operated a small department store in LaGrange at the time the store sustained a robbery loss. Owing to the father's ill health, the son had taken over the management of the business, and, during the pendency of this action Alvin Rosenberg, Sr., died and his widow as executrix was substituted in his stead as party plaintiff. L. D. Cassady is a general insurance broker and agent at LaGrange. He had no authority to bind appellant, but at the times in question had placed considerable business with it through the Paul B. Bromley Company of Louisville. The latter is owned solely by Paul B. Bromley and he was agent in Kentucky for appellant during 1951 and 1952, the years involved in this controversy. Policies were ordered by Cassady through Bromley's agency either by letter or telephone. During the two years mentioned Cassady handled all of the insurance business for appellee.

On December 22, 1951, the store was covered only by a storekeeper's burglary and robbery policy issued by the United States Fidelity & Guaranty Company. This policy included money in the safe and merchandise up to $500, but money in the two cash registers in the store was excluded. On the date just mentioned, which was on Saturday at the close of a busy week, Rosenberg called Cassady at his home and requested a binder for additional insurance on the store safe, since he had deposited a large amount of money in it. Cassady accepted the risk but failed to confirm the binder with Bromley. On the following Monday it was learned the store had been broken into and money in the cash registers and also some merchandise were stolen. Upon being notified of the incident, Cassady telephoned Bromley and told him about the binder he had placed, which as is subsequently shown, was the first time Bromley knew about it. However, no question arose about the binder coverage, for it later developed that the thieves had not been able to get into the safe and there actually was no loss from it.

Alvin Rosenberg, Jr., testified that after this loss, he awoke to the need of additional coverage on the store, so he contacted Cassady and ordered a policy to embrace in the future all money in the safe and cash registers and all merchandise and equipment in the store. This is known as an "open stock burglary policy." Cassady later came down to the store and told Rosenberg he was "fully covered" in the manner he had specified and he had "nothing to worry about." The policy issued by appellant was dated January 11, 1952, and was received by Rosenberg the next day, and he put it in the safe without reading it. This insurance turned out to be what is called a "broad form money and securities policy;" it did not cover merchandise and equipment. On October 25, 1952, the store was broken into and robbed again and considerable merchandise was taken. Rosenberg then learned for the first time from George Payton, an insurance adjuster, that the policy did not in fact cover merchandise.

L. D. Cassady testified he had a working agreement with the Paul B. Bromley Company, the agent for appellant. He related that Rosenberg called on December 22, 1951, at 9:00 p. m. and asked for a binder on the safe, and to this he agreed. On direct examination he stated he telephoned Bromley and put this purported binder in force, but on cross-examination he conceded the December break-in had already occurred before he notified Bromley about such a binder. Two to five days later, and after Rosenberg had informed him he desired more widespread coverage, Cassady said he called Bromley and ordered an open stock burglary policy for Rosenberg. He indicated he was explicit about the kind of policy he requested. According to him, before the policy was issued, Bromley was in his office at which time he brought up the matter a second time and it was after this visit the policy came through. Cassady did not read the policy when he received it but simply forwarded it on to Rosenberg.

Mrs. Georgia M. Hampton, the secretary for Cassady, testified: "I heard him (Cassady) call the Paul B. Bromley Company, and I think he talked to Paul, and he told him that he wanted the full coverage storekeepers burglary and robbery on the Rosenberg department store." Her testimony was considerably weakened on cross-examination when she stated that all she knew concerning the transaction was that Cassady called Bromley and talked to him about ordering out some type of policy. She admitted she was not paying any particular attention to the conversation.

Paul B. Bromley testified he had authority as an agent to bind appellant. He said Cassady called him on January 11, 1952, about a policy for Rosenberg and at that time, as was his practice, he made notes of the telephone conversation. That same day he wrote out a pencil memorandum from the original notes, turned it over to his secretary to write the policy from, and this memorandum, he contends, accurately reflects the information he got from Cassady respecting the issuance of the policy. This memorandum was at-

tached to the daily report kept in the office and it was later filed by appellant with its answer as an exhibit. According to Bromley, Cassady told him Rosenberg wanted only money coverage and nothing was mentioned about insurance on the stock. Bromley emphasized Cassady requested a broad form money and securities policy for the store because he specified a minimum premium of $67.50, which applies, as both well knew, to only such a policy. This particular policy, Bromley insisted, was issued for the reason that Cassady explained Rosenberg had sustained a loss whereby money was taken from the cash registers, which the United States Fidelity & Guaranty Company policy did not cover. He told Cassady the broadest coverage of this kind available was the money and securities policy, which would cover all money lost, and Cassady agreed that was the type of insurance Rosenberg should have.

Bromley remembered nothing about the alleged telephone call Cassady said he made on Monday after the December break-in relative to the binder on the safe. He further testified that about two weeks after the October loss had occurred, which this suit undertakes to recover, Cassady called him and asked if he could persuade appellant to take care of it by issuing a postdated policy. Bromley said if an open stock burglary policy is ordered an inspection of the premises is required by appellant before such a policy can be issued, and he insists he could not and would not have bound the coverage on an open stock burglary policy without such an inspection of the premises.

This, in substance, is the proof upon which reformation was granted. The question posed is: Does the evidence adduced meet the test laid down by this Court for reforming an executed contract? We do not believe it does.

■ To justify reformation of a written instrument the evidence must be clear, strong and convincing, or, as has been sometimes said, "'full, clear, and decisive.'" This statement was made in Royer Wheel Co. v. Miller, 50 S.W. 62, 20 Ky.Law Rep. 1831, and it has many times since been approved: "'Mere preponderance of evidence is not enough; the mistake (or other ground) must appear beyond reasonable controversy.'" Svea Fire & Life Ins. Co. v. Foxwell, 234 Ky. 95, 27 S.W.2d 675; Johnson v. Elkhorn Gas Coal Mining Co., 193 Ky. 585, 236 S.W. 1041; Litteral v. Bevins, 186 Ky. 514, 217 S.W. 369.

■ This stringent requirement was set forth in Sutherland Bros. v. Travelers' Ins. Co., 245 Ky. 756, 54 S.W.2d 340, 342, where the reformation of a compensation policy was sought on the ground of mutual mistake: "* * * In such case the law as to reformation is that: 'The burden being on the party alleging the mistake, to establish that fact, reformation will not be granted in the absence of strong and most satisfactory evidence of the mistake. A direct conflict of testimony is conclusive against the reformation of an instrument.'" See also Aetna Ins. Co. v. Steele, 222 Ky. 57, 299 S.W. 1091; Griffith v. York, 152 Ky. 14, 153 S.W. 31.

■ Measuring appellee's contention that a mutual mistake was made in the issuance of the policy by the standard set up for determining such a claim, we are drawn to the inevitable conclusion that the evidence presented fails to establish this alleged fact. The mistake must be that of both parties, one that occurs in the drafting of an instrument, so that it expresses the intent of neither party to the contract. Such a mistake was not proven in this case. The evidence is in sharp conflict on the issue involved, and to reform the policy to accord with appellee's line of testimony, when appellant's proof shows the policy correctly expresses the agreement as understood by it, would be to do right to appellee at the expense of a precisely equal wrong to appellant. We are therefore of the opinion the chancellor

erred when he decreed a reformation in favor of appellee.

Wherefore, the judgment is reversed with directions that it be set aside and a new one entered dismissing the complaint.